**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **YOLANDA R. EFFINGER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Case No.: 2:07-CV-657-ID-TFM** |
| | * | |
| **WINN-DIXIE MONTGOMERY, INC.** | * | |
| | * | |
| **Defendant.** | * | |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW Defendant, pursuant to Rule 56, F.R.C.P. and herewith moves this Court to enter in its favor a judgment on the grounds there exists no genuine material issue of fact and that this Defendant is entitled to judgment as a matter of law.

In support of this Motion, Defendant submits the attached excerpts from the depositions of Plaintiff and from Sonja Davis, and the attached Affidavit of Adam Dollar.  Contemporaneously with the filing of this Motion, Defendant also submits a Brief in support of said Motion.

/s/ *Randall Morgan*
RANDALL MORGAN [MOR037]
Defendant Winn-Dixie Montgomery, Inc

OF COUNSEL:
**HILL, HILL, CARTER, FRANCO,
  COLE & BLACK, P.C.**
425 South Perry Street
P.O. Box 116
Montgomery, Alabama 36101-0116
(334) 834-7600
(334) 263-5969..FAX

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this the 2nd day of September, 2008, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following via email:

Ronald B.  Hatcher, Esq.
P.O. Box 161442
Atlanta, GA 30321

                /s/ *Randall Morgan*
                OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| YOLANDA R. EFFINGER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: 2:07-CV-657-ID-TFM |
| | * | |
| WINN-DIXIE MONTGOMERY, INC. | * | |
| | * | |
| Defendant. | * | |

## AFFIDAVIT OF ADAM DOLLAR

Before me, the undersigned Notary Public in and for said County and State, did personally appear Adam Dollar, who after being duly sworn did depose and state as follows:

"I was the manager on duty. At that time I had been employed with Winn Dixie for approximately 9 years. I reported to work about noon that day.

As you enter this store, the buggies are immediately to the right in a corral. The area where this incident happened is between the cash registers and the side of the buggy corral. If Plaintiff went to the produce section first she would have traveled in the area where the incident allegedly occurred.

Winn Dixie has a floor cleaning service that cleans, buffs and mops every night except for Sunday night. Since this incident occurred on Sunday afternoon, the floor cleaning service had been there the night before. Additionally, Winn-Dixie employees are trained to look for spills and foreign objects on the floor and to report and clean up if necessary. Additionally, as the manager, frequently, at least once an hour I walk the entire store checking for unsafe conditions. My inspection includes the front area

1

where this incident allegedly occurred.

During my inspections in the front, I did not discover any water or other foreign substance on the floor in front of the cash registers.  No one advised me of any problem with the floor in this area.  I checked and none of the employees were aware of any water on the floor."

[SIGNATURE ON FOLLOWING PAGE]

_(signature)_

ADAM DOLLAR


SWORN TO and subscribed before me this the 2nd day of September, 2008.

[SEAL]

_(signature)_

NOTARY PUBLIC

My Commission Expires: 8/1/2012

3

ORIGINAL

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    YOLANDA R. EFFINGER,

6         Plaintiff,

7    Vs.                                    CIVIL ACTION NO.
                                            2:07-CV-657-ID-TRM
8    WINN-DIXIE MONTGOMERY, INC.,

9         Defendant.

10

11

12              * * * * * * * * * * *

13

14    **DEPOSITION OF YOLANDA R. EFFINGER**, taken pursuant

15    to stipulation and agreement before Pamela A. Wilbanks,

16    Certified Court Reporter, ACCR# 391, Registered

17    Professional Reporter and Commissioner for the State of

18    Alabama at Large, in the Law Offices of Davis & Hatcher,

19    4183-B Carmichael Road, Montgomery, Alabama, on Monday,

20    January 21, 2008, commencing at approximately 10:00 a.m.

21

22              * * * * * * * * * * * *

23

5

BY MR. MORGAN:

Q.    State your name, please.

A.    Yolanda Rochelle Effinger.

Q.    How do you pronounce it?

A.    Effinger.

Q.    Effinger?  Am I saying it right?

A.    Yes.

Q.    Is that your maiden name or married name?

A.    Married name.

Q.    What is your maiden name?

A.    Anderson.

Q.    And are you currently married?

A.    I'm divorced.

Q.    And what was your -- is your ex-husband's name?

A.    Evandelish Effinger.

Q.    Where is he from?

A.    He's originally from Selma.

Q.    Where does he live now?

A.    Columbus, Georgia.

Q.    Where are you from originally?

A.    Selma.

Q.    And have you always lived in Selma?

A.    No.

28

```
 1    A.   Mary Johnson.

 2    Q.   And do you have a written contract or lease with

 3         her for that space?

 4    A.   Not at a written contract.

 5    Q.   What kind of contract do you have?

 6    A.   It's a booth rental on a month-to-month basis.

 7    Q.   Is the contract in writing or is it just word of

 8         mouth?

 9    A.   Word of mouth.

10    Q.   And how much is it a month that you pay?

11    A.   My booth rent is 250.  It was 225.

12    Q.   How long have you been renting a booth from Mary

13         Johnson?

14    A.   End of 2004-2005.  I would have to check my

15         business license for the exact.

16    Q.   And what services do you offer at the rental

17         booth?

18    A.   Beauty consultations, makeovers, facials,

19         eyebrow archings and eyebrow waxings.  And I

20         also offer products from Iman Cosmetics and

21         Flori Roberts.

22    Q.   From where?

23    A.   Iman Cosmetics.
```

41

```
1    A.    No.

2    Q.    Why did y'all select this Winn Dixie?

3    A.    Because we stopped at the book store.

4    Q.    And what was the name of the book store?

5    A.    Either Books-A-Million or Barnes & Noble.  I'm

6          not for sure which one.

7    Q.    Did you travel up and down all the aisles or

8          were you looking for specific items?

9    A.    We were just shopping.  Different aisles.

10   Q.    Well, did you start in the produce and --

11   A.    Yes.

12   Q.    -- go up and down each aisle?

13   A.    Yes.

14   Q.    Do you remember who selected the buggy, either

15         you or your sister?

16   A.    No, I don't.

17   Q.    When you entered the store, that front area, as

18         either you or your sister were selecting a

19         buggy, did you notice any uncleanliness or water

20         on the floor or any problems with the front

21         area?

22   A.    No.

23   Q.    I guess as you enter the store -- were the cash
```

42

1    registers on the left side or right side as you
2    entered the store?
3  A.   They were just in the front of the store.
4  Q.   And that's where you would get your buggy, from
5    the front of the store?
6  A.   No.  The buggies were on the ...
7  Q.   To the right?
8  A.   On the side.  In front of a window.
9  Q.   So the buggies were to the side, and the cash
10    registers, I guess, would have been in front of
11    you as you entered the store?
12  A.   As you entered the store, the cash registers are
13    here and the buggies are here.
14  Q.   Did you observe any uncleanliness or problems in
15    the front area there in front of the cash
16    registers?
17  A.   No.
18  Q.   And you don't recall how long you were in the
19    store?
20  A.   No.
21  Q.   Whichever one of you selected the buggy, I guess
22    y'all went over to the produce department and
23    started there?

43

1    A.    Yes.

2    Q.    And then just went up and down the aisles, true?

3    A.    Yes.

4    Q.    What did you think the overall cleanliness of

5          the store was?  Did it appear to be a clean

6          store?

7    A.    Appeared to be like a normal Winn Dixie store.

8    Q.    You didn't notice any unsafe areas or water --

9    A.    No.

10   Q.    -- water on the floor?

11              MR. HATCHER:  Object to the form.  You

12                   can answer if you understand the

13                   question.

14   Q.    Did you notice anything on the floor that

15         concerned you as you were going around?

16   A.    No.

17   Q.    And you didn't report to anybody that there was

18         any problem with the floor, did you?

19   A.    No.

20   Q.    Do you recall which cash register you checked

21         out?

22   A.    Register number 7.

23   Q.    And who checked out first, you or your sister?

48

1          get another buggy.

2    Q.   Did he know you and your sister were together?

3    A.   Yes.

4    Q.   How did he know that?

5    A.   We were standing side by side.

6    Q.   So what did you do at that point?

7    A.   I turned, took a few steps, and that's when I

8         fell.

9    Q.   So you turned from register 7, and were you --

10       Where were you intending to go?

11    A.   Walking towards where they keep the carts.

12    Q.   And that would have been the same place you had

13       picked up a cart earlier?

14    A.   Yes.

15    Q.   So would you have been walking to your left or

16       to your right from the register?

17    A.   This is the register, this is me, and I went

18       this way (indicating.)

19    Q.   If you would, could you draw me a picture of

20       that front section showing where the front

21       door --

22    A.   I will try.

23    Q.   If you would, draw the cash register and the

50

1    Q.    Yes?

2    A.    Yes.

3    Q.    And selected a buggy?

4    A.    Yes.

5    Q.    And then y'all would have, I guess, pushed your

6          buggy this way in front of the registers over

7          here to the produce?

8    A.    Yes.  They have a little bench -- They had a

9          little bench over here.

10   Q.    So as you entered the store when you selected

11         your buggy, you and your sister would have

12         pushed it between the bench and the cash

13         registers over to the other side of the store

14         for the produce?

15   A.    Yes.

16   Q.    When you did that -- When you made that trip

17         across the front of the store there in front of

18         the cash registers, did you see or observe any

19         water or foreign substance on the floor that

20         could have caused someone to slip?

21   A.    No.

22   Q.    And then you left aisle 7 after you purchased

23         your groceries and started walking back over

51

1          towards --

2     A.    I got to about right here (indicating.)

3                         MR. HATCHER:  Could we just go off for

4                    a second?

5                         (Brief off-the-record discussion.)

6     Q.    Do you want to circle that X?

7     A.    (Witness complies.)

8                         MR. HATCHER:  Now, what was the

9                    question?  What was this X for

10                   again?

11                        THE WITNESS:  This is where I fell.

12    Q.    So you only took a few steps?

13    A.    A few steps.

14    Q.    So did you fall in front of register 6?

15    A.    Yes.

16    Q.    How many steps did you take after you left

17          register 7 before you fell?

18    A.    Approximately three steps.

19    Q.    As you took those three steps, did you observe

20          anything on the floor that could have caused you

21          to fall?

22    A.    No.

23    Q.    Were there any buggies or obstructions or

52

1          anything in your way --

2      A.   No.

3      Q.   -- after you left register 7 before you reached

4          the spot where you've marked that you fell?

5      A.   No.

6      Q.   Do you know why you did not see anything on the

7          floor before you fell?

8               MR. HATCHER:  Objection to the form.

9      A.   Repeat the question.

10     Q.   Do you know why you didn't see anything on the

11         floor before you fell?

12              MR. HATCHER:  Same objection.

13              Objection to the form.

14     Q.   You can answer.

15              MR. HATCHER:  If you understand the

16              question, you can answer.

17     A.   Oh, okay.  Repeat the question.

18     Q.   Do you know why you did not see anything on the

19         floor before you fell?

20     A.   I wasn't looking for it.

21     Q.   What is it that you claim you fell in?  What was

22         there on the floor?

23     A.   It was a liquid substance.

53

1    Q.    Do you have any -- Do you know what it was?

2    A.    No.

3    Q.    Do you know what color it was?

4    A.    It appeared to be a reddish-pinkish color.

5    Q.    So you did not see it at all before you fell?

6    A.    No, I didn't.

7    Q.    Do you know how long it had been on the floor

8          before you fell?

9    A.    No.

10   Q.    Did any Winn Dixie person make any statements

11         about how long it had been on the floor?

12   A.    Mr. Dollar asked the bagger and the cashier.

13   Q.    Asked them what?

14   A.    If they had noticed it.

15   Q.    And what did they say?

16   A.    No.

17   Q.    Do you have any evidence that anyone from Winn

18         Dixie knew it was on the floor before you fell?

19   A.    No.

20   Q.    And do you remember if this aisle that you've

21         marked as -- register that you've marked as

22         number 6, do you remember if it had a person

23         there?

54

1    A.    No.

2    Q.    Just don't remember one way or the other?

3    A.    I don't remember.

4    Q.    Before this incident occurred, are the only two

5          employees that you spoke with the cashier and

6          Jeremy, the bag boy?

7    A.    Yes.

8    Q.    And your sister was still in line?

9    A.    Yes.

10   Q.    Was there anybody behind her?

11   A.    I'm not for sure.

12   Q.    Had you had to wait for somebody before they

13         started ringing up your groceries?  Were there

14         people ahead of you?

15   A.    Yes.

16   Q.    How many people were there ahead of you?

17   A.    I'm not for sure.

18   Q.    More than one?

19   A.    I'm not for sure.

20   Q.    At least one?

21   A.    There was someone checking out.

22   Q.    So as you started walking from register 7 over

23         towards the buggies, which foot slipped first?

57

1          you sitting on it?

2     A.   My hand was in it.  My right hand.

3     Q.   Was it sticky?  Feel like juice?  Did it feel

4          like water?  What did it feel like?

5     A.   I don't recall.  Just wet.

6     Q.   Do you have any recollection as to how large the

7          amount of this red or pink substance was on the

8          floor?

9     A.   I don't recall.  There was a puddle.

10    Q.   I assume it had gotten larger when you fell in

11         it or at least spread out more?

12              MR. HATCHER:  Objection to the form.

13    A.   No.

14              MR. HATCHER:  Objection to the form.

15              Calls for speculation.  Answer

16              if --

17    Q.   You don't know what it looked like before, do

18         you?

19    A.   No.

20    Q.   Do you have any opinion as to what that

21         substance was?

22    A.   Just liquid, red -- pinkish in color.

23    Q.   So tell me about the conversation with you and

58

1          Mr. Dollar when he came over.

2    A.    When he came over, he looked at the cashier and

3          the bagger and asked them if they noticed it or

4          why they didn't notice whatever the object was

5          on the floor.  That's when he started to wipe it

6          up.

7    Q.    What did they say when he asked them had they

8          noticed it?

9    A.    They said no.

10   Q.    Were you still sitting on the floor when he

11         started wiping it up?

12   A.    Yes.

13   Q.    What was it?  What did he use to wipe it up

14         with?

15   A.    A white paper.

16   Q.    Like a paper towel?

17   A.    Yes.

18   Q.    Was he able to wipe it up with the paper towel?

19   A.    He wiped for a minute.

20   Q.    Well, did he get it all up?

21   A.    Yes.

22   Q.    What kind of clothes did you have on?

23   A.    I had on a jean jumper with sandals.

59

1    Q.    Had you ever slipped or fallen in those sandals

2          before?

3    A.    No.

4    Q.    The jean jumper, was it a denim color?

5    A.    Yes.

6    Q.    Do you still have it or have you had it washed

7          since that day?

8    A.    Repeat the question.

9    Q.    The jean jumper, did you have it cleaned or do

10        you still have it?

11    A.    It's been cleaned.

12    Q.    Did you take any pictures of it showing any

13        foreign substance or color on it or anything?

14    A.    I don't understand the question.

15    Q.    Did your jean jumper land in the water or the

16        substance on the floor?

17    A.    No.

18    Q.    Well, what landed in the substance?  Your foot

19        just went through it?

20    A.    My foot went through it.

21    Q.    And you didn't land in it?

22    A.    No.

23    Q.    And the manager cleaned it up with paper towels?

106

| | | |
|---|---|---|
| 1 | A. | My line of work. |
| 2 | Q. | So if I had a business there and I made a |
| 3 | | million dollars a year doing that, I would pay |
| 4 | | the same business license as you? |
| 5 | A. | Yes. |
| 6 | Q. | Now, you've sued Winn Dixie in this case.  What |
| 7 | | is it that you say Winn Dixie did wrong? |
| 8 | A. | Repeat the question. |
| 9 | Q. | What do you think Winn Dixie did wrong that |
| 10 | | resulted in you being injured? |
| 11 | A. | What did they do wrong? |
| 12 | Q. | Uh-huh (positive response). |
| 13 | A. | I feel that they were negligent. |
| 14 | Q. | Well, I mean how?  What is it that they did or |
| 15 | | didn't do that you think -- |
| 16 | A. | One thing that they did not do is they never |
| 17 | | contacted me to see if I was okay or anything. |
| 18 | | Up until this day I haven't heard from Winn |
| 19 | | Dixie.  And Mr. Dollar stated that his manager |
| 20 | | would get back with me. |
| 21 | Q. | Anything else that you can think of that Winn |
| 22 | | Dixie did wrong that you think caused your |
| 23 | | injuries? |

ORIGINAL                                     1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5    YOLANDA R. EFFINGER,

6              Plaintiff,

7    Vs.                              CIVIL ACTION NO.
                                      2:07-CV-657-ID-TFM
8    WINN-DIXIE MONTGOMERY,
     INC.,
9
               Defendant.
10

11

12                 *  *  *  *  *  *  *  *  *  *  *  *  *

13

14            **DEPOSITION OF SONJA DAVIS**, taken pursuant to

15   stipulation and agreement before Pamela A. Wilbanks,

16   Certified Court Reporter, ACCR# 391, Registered

17   Professional Reporter and Commissioner for the State of

18   Alabama at Large, in the Law Offices of Hill, Hill,

19   Carter, Franco, Cole & Black, 425 South Perry Street,

20   Montgomery, Alabama, on Monday, August 18, 2008,

21   commencing at approximately 12:55 p.m.

22

23                 *  *  *  *  *  *  *  *  *  *  *  *  *

4

1   signature of the witness to this deposition is hereby

2   waived.

3

4                   * * * * * * * * * * * *

5

                          **SONJA DAVIS**

6

          The witness, after having first been duly sworn

7

    to speak the truth, the whole truth and nothing but the

8

    truth testified as follows:

9

                          **EXAMINATION**

10

    **BY MR. MORGAN:**

11

       Q.   If you would, state your name, please.

12

       A.   Sonja Davis.

13

       Q.   Ms. Davis, where do you live?

14

       A.   2132 Greenview Drive, Montgomery, Alabama 36104.

15

       Q.   And how long have you lived there?

16

       A.   Two years.

17

       Q.   Who do you live there with?

18

       A.   My husband and my two children.

19

       Q.   What's your husband's name?

20

       A.   McArthur Davis.

21

       Q.   What does he do?

22

       A.   He's a lieutenant in the Montgomery Fire

23

            Department.

9

| | | |
|---|---|---|
| 1 | A. | 9/16/66. |
| 2 | Q. | What are the last four digits of your social? |
| 3 | A. | 2932. |
| 4 | Q. | And do you know your driver's license number? |
| 5 | A. | Yes. |
| 6 | Q. | What is that? |
| 7 | A. | 3157129. |
| 8 | Q. | And you were with Yolanda Effinger who is your |
| 9 | | sister? |
| 10 | A. | Correct. |
| 11 | Q. | And you were with her at the time of this |
| 12 | | accident? |
| 13 | A. | Correct. |
| 14 | Q. | How long have you lived in Montgomery County? |
| 15 | A. | Eleven years. |
| 16 | Q. | And where did you move from? |
| 17 | A. | Georgia. |
| 18 | Q. | Where does Ms. Effinger live? |
| 19 | A. | She lives in Selma. |
| 20 | Q. | Do you know the name of the -- Does she live in |
| 21 | | an apartment complex or a private home?  Do you |
| 22 | | know? |
| 23 | A. | She lives in a private home. |

13

| | | |
|---|---|---|
| 1 | A. | She did not. |
| 2 | Q. | What time did you arrive at the Winn Dixie? |
| 3 | A. | It was approximately about -- probably about |
| 4 | | four. |
| 5 | Q. | And how long were you shopping in the store? |
| 6 | A. | About an hour. |
| 7 | Q. | Now, did you have your buggy and she had a |
| 8 | | separate buggy or were both of y'all using the |
| 9 | | same buggy? |
| 10 | A. | We used the same buggy. |
| 11 | Q. | Tell me what you did when you entered the |
| 12 | | store.  Did you select the buggy or did |
| 13 | | Ms. Effinger select the buggy? |
| 14 | A. | I can't remember who selected a buggy.  I just |
| 15 | | know that we had one buggy.  We got -- grabbed a |
| 16 | | buggy, and we started off in the produce section |
| 17 | | and went through the store. |
| 18 | Q. | So one of you selected a buggy from the little |
| 19 | | buggy corral? |
| 20 | A. | Yes. |
| 21 | Q. | And then you actually would have pushed in front |
| 22 | | of some cash registers? |
| 23 | A. | Yes. |

14

| | |
|---|---|
| 1 | Q. And would have then gone to the produce, which |
| 2 | was on the far side of the store? |
| 3 | A. Right. |
| 4 | Q. And then did you go up and down all the aisles? |
| 5 | A. All the aisles. |
| 6 | Q. Now, up until the time you arrived at the |
| 7 | cashier place, check-out counter, did you see |
| 8 | any problems with the store? Did it appear to |
| 9 | be a clean store? |
| 10 | MR. HATCHER: Objection to the form. |
| 11 | Q. Did you notice any problems with the store in |
| 12 | terms of cleanliness? |
| 13 | A. No, I didn't. |
| 14 | Q. At that time how often did you shop in that |
| 15 | store, say, on average in a week? |
| 16 | A. Probably about two or three times a week. |
| 17 | Q. And currently how frequently do you shop there? |
| 18 | A. About two or three times a week. |
| 19 | Q. When you arrived at the check-out counter, were |
| 20 | there any buggies in front of you as you were |
| 21 | checking out or waiting to check out? |
| 22 | A. Yes. |
| 23 | Q. Do you remember how many? |

15

1    A.    No, I do not.

2    Q.    But at least one?

3    A.    Yes.

4    Q.    Did you see what they had in their buggy, any

5         purchases they were making?

6    A.    No, I did not.

7    Q.    Did you know the cashier?

8    A.    No.

9    Q.    What register do you recall that y'all were

10        checking out of?

11   A.    If I can recall, it was either register 7 or 8.

12        I think it was register 8 that we checked out

13        of.

14   Q.    Did you recognize any of --

15            I still call them bag boys; I think they

16        call them baggers now.

17            -- any of the young men that were helping

18        folks with the groceries?  Did you recognize any

19        of them?

20   A.    No.

21   Q.    The manager is named Adam Dollar, the manager on

22        duty that day.  Did you know him?

23   A.    No.

16

| | | |
|---|---|---|
| 1 | Q. | Is Sunday one of the two or three times a week |
| 2 | | that you usually shopped? |
| 3 | A. | It varies. |
| 4 | Q. | Just whenever you need to go? |
| 5 | A. | Yes. |
| 6 | Q. | I do the same thing. |
| 7 | | So when the person ahead of you exited, |
| 8 | | whose groceries were checked out first, yours or |
| 9 | | your sister's? |
| 10 | A. | Yolanda's was checked out first. |
| 11 | Q. | Do you remember what she bought? |
| 12 | A. | No, I can't remember what she brought (sic). |
| 13 | Q. | Do you remember what you bought? |
| 14 | A. | No, I can't remember what I brought (sic). |
| 15 | Q. | Tell me what happened.  Did anything occur while |
| 16 | | she was checking out other than the young lady |
| 17 | | scanned the groceries and put them in a bag and |
| 18 | | then were they put in a buggy? |
| 19 | | MR. HATCHER:  Objection to the form. |
| 20 | A. | Yes. |
| 21 | Q. | Then what happened? |
| 22 | A. | Other than that -- Ask me the question again, |
| 23 | | please. |

17

| | | |
|---|---|---|
| 1 | Q. | You tell me if this is correct.  I assume when |
| 2 | | y'all got there that Ms. Effinger put her |
| 3 | | groceries up on the little counter, true? |
| 4 | A. | True. |
| 5 | Q. | And then they would have gone down, and the lady |
| 6 | | would have scanned then? |
| 7 | A. | Yes. |
| 8 | Q. | Do you recall who bagged them? |
| 9 | A. | There was a bag boy. |
| 10 | Q. | Do you remember his name? |
| 11 | A. | No, I don't. |
| 12 | Q. | Could you give me any description of him? |
| 13 | A. | I can't recall.  The only thing I remember, it |
| 14 | | was an African-American.  That's all I can tell |
| 15 | | you. |
| 16 | Q. | And once the groceries were scanned and he put |
| 17 | | them in bags, did he then put them in the buggy? |
| 18 | A. | Yes. |
| 19 | Q. | And when they finished with her order, did you |
| 20 | | then put yours up on the counter? |
| 21 | A. | Yes. |
| 22 | Q. | And what was she doing while your groceries were |
| 23 | | being scanned?  What was Ms. Effinger doing? |

18

1    A.    She was standing at the end of the counter.

2    Q.    Now, did she leave the end of the counter at

3          some point?

4    A.    Yes.

5    Q.    Were your groceries still being scanned --

6    A.    Yes.

7    Q.    -- when she left?

8    A.    Yes.

9    Q.    Were her bagged-up groceries still in the buggy

10         close to the end of that?

11                    MR. HATCHER:   Objection to the form.

12   Q.    Were her groceries still in the buggy at the end

13         of the cashier register when she left and --

14   A.    They were still being placed.  She told me she

15         was going to get another buggy because that one

16         was being filled up.  There was not going to be

17         enough room in that buggy to put my groceries

18         in.

19   Q.    So her purpose in leaving was they were going to

20         use the buggy that the two of you had gotten

21         your purchases in -- they were going to use that

22         for her, and then she was going to go get

23         another buggy for your stuff?

20

1        the end of that register?

2                    MR. HATCHER:  Objection to the form.

3                    Go ahead.

4    Q.  What did she do then?  Did she leave the

5        register area where you were?

6    A.  She turned to walk away.

7    Q.  Now, up to that time, had you had any

8        conversation with the cashier?

9    A.  No.

10   Q.  Had you had any conversation with the bag boy?

11   A.  No.

12   Q.  Did you have any complaints about the way the

13       bag boy was bagging the groceries?

14   A.  No.

15   Q.  Did you hear Ms. Effinger say anything to the

16       bag boy about the way he was bagging the

17       groceries?

18   A.  No.

19   Q.  How far did she walk after she left the

20       register?

21   A.  She walked about two to three steps.

22   Q.  And in what direction?

23   A.  Can I show you?

22

1         If I remember the store, the entrance would

2         have been down here?

3  A.   Yeah.  The entrance, because the produce

4         department is here (indicating.)

5  Q.   Right.

6  A.   The entrance is here (indicating.)

7  Q.   And then to get to the buggy corral, she had to

8         walk back and go around --

9  A.   Yes.

10  Q.   She couldn't just walk straight across?

11  A.   No.

12  Q.   She had to go back and actually come back up

13         into the buggy corral?

14  A.   Right.  And this is where she slipped and fell

15         (indicating).

16  Q.   Now, were you watching her as she left?

17  A.   When she made the statement that she's going --

18         When she told me that she's going to go and get

19         another buggy, I turned and told her okay.  And

20         then I turned back to watch the cashier ring my

21         groceries up.  And then I heard her -- a noise

22         go "oh," and I heard a boom.  And when I turned,

23         she was on the floor.

23

| | | |
|---|---|---|
| 1 | Q. | So you didn't actually see her fall? |
| 2 | A. | No. |
| 3 | Q. | Do you know of anybody that may have seen her |
| 4 | | fall? |
| 5 | A. | Not unless -- I don't know if the people that |
| 6 | | were coming in the store could have seen her |
| 7 | | fall or the bagger could have -- because he |
| 8 | | would have been right in her line. |
| 9 | Q. | Ms. Taylor, when she entered the store, was it |
| 10 | | after Ms. Effinger had already fallen? |
| 11 | A. | I don't know if she entered when she was falling |
| 12 | | or afterward because I never asked her. |
| 13 | Q. | When you heard, I assume it was, Ms. Effinger |
| 14 | | say "oh" -- |
| 15 | A. | Uh-huh (positive response). |
| 16 | Q. | -- and then a boom, I assume the boom is her |
| 17 | | hitting the ground? |
| 18 | A. | Yes. |
| 19 | Q. | And when you turn to look at her, how was she |
| 20 | | situated on the floor? |
| 21 | A. | Her legs were out, and her hands were on her |
| 22 | | sides.  She was sitting kind of -- |
| 23 | Q. | Sitting on her butt? |

24

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | With her legs outstretched? |
| 3 | A. | Yes. |
| 4 | Q. | And her arms or hands on the side of her? |
| 5 | A. | Yes. |
| 6 | Q. | Just like this sitting on her rear end |
| 7 | | (indicating)? |
| 8 | A. | Yes. |
| 9 | Q. | And what did you do? |
| 10 | A. | I went over to her. |
| 11 | Q. | And what did she say? |
| 12 | A. | She said that she had slipped on something. |
| 13 | Q. | Did any of the -- Did any Winn Dixie employee go |
| 14 | | over there with you to see about Ms. Effinger or |
| 15 | | did you go over there by yourself? |
| 16 | A. | I went by myself. |
| 17 | Q. | Did either the cashier or the bag boy ever go |
| 18 | | over to see about her? |
| 19 | A. | No. |
| 20 | Q. | So when you arrived to where she was sitting, |
| 21 | | she said she slipped on something? |
| 22 | A. | Uh-huh (positive response). |
| 23 | Q. | Yes? |

25

1    A.    Yes.

2    Q.    And what did you do then?

3    A.    I looked around to see what she could have

4          slipped on.

5    Q.    Did you see anything?

6    A.    Yes.

7    Q.    What was it?

8    A.    It was a wet substance on the floor.

9    Q.    Now, what color was the wet substance?

10   A.    It had a kind of pink tinge to it.

11   Q.    Do you know what it was?

12   A.    I can speculate on what it was.

13   Q.    Answer me this question first.  Do you know what

14         it was?

15   A.    No, I do not.

16   Q.    If you were going to speculate, what would you

17         speculate?

18   A.    You know how the drippings from a chicken -- a

19         chicken package ...

20   Q.    Did you notice whether the people that checked

21         out ahead of you had purchased chicken?

22   A.    No, I did not.

23   Q.    Did Ms. Effinger purchase chicken?

26

| | | |
|---|---|---|
| 1 | A. | I don't think so.  I can't remember.  I don't |
| 2 | | think so. |
| 3 | Q. | Was she sitting in this wet substance? |
| 4 | A. | Yeah.  Her hand was in it, and her leg was in it |
| 5 | | because her dress was wet. |
| 6 | Q. | So is it fair to say that you never saw the |
| 7 | | substance on the floor before Ms. Effinger fell |
| 8 | | in it? |
| 9 | A. | Correct. |
| 10 | Q. | Did you hear anybody from Winn Dixie say |
| 11 | | anything about how the substance may have gotten |
| 12 | | on the floor? |
| 13 | A. | No. |
| 14 | Q. | Did you hear anybody from Winn Dixie say |
| 15 | | anything about how long it had been on the |
| 16 | | floor? |
| 17 | A. | No. |
| 18 | Q. | But when you saw it, it had a pink tinge like -- |
| 19 | A. | A light pink tinge. |
| 20 | Q. | Your speculation being like a little bloody |
| 21 | | substance to it? |
| 22 | A. | Yes. |
| 23 | Q. | And it was a wet substance? |

27

1   A.   Yes.

2   Q.   And then what did you do when you observed that?

3   A.   I asked for the manager of the store -- got one

4        of the employees to go get the manager of the

5        store.

6   Q.   Did someone do that?

7   A.   The bagger went and got the manager of the

8        store.

9   Q.   The same bagger that had bagged her groceries --

10   A.   Yes.

11   Q.   -- and I guess would have bagged your groceries?

12   A.   Yes.

13   Q.   Did you see where he went when he went to get

14        the manager?

15   A.   He went toward the office.

16   Q.   And did you observe whether he went outside to

17        get the manager or -- After you saw the

18        direction he was headed, did you put your

19        attention back to your sister or did you see

20        where he went?

21   A.   I saw which way he went.

22   Q.   Where did he go?

23   A.   He went toward the office.

28

```
 1    Q.    Do you know if he went outside to get the
 2          manager?
 3    A.    He did not go outside.
 4    Q.    And did the manager come?
 5    A.    Yes.
 6    Q.    And fairly quickly?
 7    A.    Yes.
 8    Q.    And he was a white guy?
 9    A.    Yes.
10    Q.    And you did not recognize him?
11    A.    No, I did not.
12    Q.    What did he say or do when he arrived with your
13          sister?
14    A.    He asked the bagger why wasn't there a wet floor
15          sign on the floor.
16    Q.    And what did the bagger say?
17    A.    The bagger said that he did not know there was a
18          wet spot on the floor.
19    Q.    And then who said what next?
20    A.    The manager asked -- he went and got a piece of
21          paper towel and tried to wipe up the spill.
22    Q.    Was he able to do that?
23    A.    Was he able to wipe up the spill?
```

1    Q.    Yes, ma'am.

2    A.    Yes.

3    Q.    With that piece of paper towel?

4    A.    Yes.

5    Q.    Where did he get that from?

6    A.    From off the counter.  From the aisle next to

7          where we were.

8    Q.    If these go in order, then -- by order I mean

9          the lowest ones are closest to the front door --

10         this would have been aisle 7?

11   A.    Uh-huh (positive response).

12   Q.    Yes?

13   A.    Yes.

14   Q.    So your recollection is that the fall actually

15         occurred at the end of aisle 7?

16   A.    Yes.

17   Q.    So he got a piece -- just a regular paper towel?

18   A.    Yes.

19   Q.    And wiped up the substance off the floor?

20   A.    Yes.

21   Q.    And then what did he do?

22   A.    He asked Ms. Effinger was she okay.

23   Q.    What did she say?

33

```
 1              MR. HATCHER:  Objection to the form.
 2    Q.   As far as you know?
 3              MR. HATCHER:  Same objection.
 4    Q.   Well, did you see any of the other employees do
 5         anything in terms of helping your sister or
 6         trying to find out what was on the floor or
 7         anything?
 8    A.   No, I did not.
 9    Q.   So the conversations that you had with the other
10         employees other than Mr. Dollar about this
11         accident is you asked a bag boy to go get the
12         manager?
13    A.   Uh-huh (positive response).
14    Q.   Which he did?
15    A.   Yes.
16    Q.   And then when Mr. Dollar asked the bagger why
17         there was no "wet floor" sign out, the bagger
18         said he didn't know there was a wet spot?
19    A.   Correct.
20    Q.   Did you hear that bagger say anything else?
21    A.   No, I did not.
22    Q.   Did you ever hear the cashier say anything?
23    A.   No, I did not.
```